IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2021

## IN RE AUSTIN W.

**Appeal from the Chancery Court for Giles County**
**No. 299        Stella L. Hargrove, Judge**

_____

**No. M2020-01315-COA-R3-PT**

_____

This appeal involves the termination of a father's parental rights to his young son. The trial court found by clear and convincing evidence that four grounds for termination were proven and that termination was in the best interest of the child. We affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Casey A. Long, Lawrenceburg, Tennessee, for the appellant, Kelsey W.

Stacie L. Odeneal, Lawrenceburg, Tennessee, for the appellees, Chasity W. and William W.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

Austin W. was born to unmarried parents in November 2014.[1] Austin's birth certificate lists his parents as Shelby C. ("Mother) and Kelsey W. ("Father").[2] Initially, Mother, Father, and Austin resided in a one-bedroom apartment in income-based housing. On December 31, 2014, Mother and Father arranged for one-month-old Austin to stay with Mother's aunt and uncle ("Aunt" and "Uncle") for the first time, so that Mother and Father

_____

[1] We refer to the parties using initials in order to protect the privacy of the child.
[2] Mother had been married to another man until June 2014.

could go out for New Year's Eve. In the days and months that followed, Mother and Father continually left Austin in the care of Aunt and Uncle for extended periods, even though Father was unemployed. Mother would drop Austin off at Aunt's place of employment or call Aunt to come and get Austin from the apartment when she and Father were hosting parties or fighting.

Although Father was only 22 when Austin was born, he had a lengthy criminal history. Prior to Austin's birth, he had pled guilty to numerous charges, including attempted possession of a prohibited weapon, simple possession of marijuana, underage consumption of alcohol, vandalism between $1,000 and $10,000, theft of property between $1,000 and $10,000, and possession of methamphetamine. He had also violated his probation on numerous occasions. Thus, Father had been incarcerated several times related to these offenses.

In April 2015, when Austin was four months old, Father violated his probation again by failing a drug screen, testing positive for amphetamines. He spent two days in jail in May. On June 11, 2015, Father tested positive for methamphetamine and amphetamines on a drug screen, and his probation officer conducted a home visit at the apartment. During a search of the apartment, officers found methamphetamine in the bedroom along with a box in the living room containing drug paraphernalia and a revolver. Thus, Father was charged with simple possession of methamphetamine, possession of drug paraphernalia, and felon in possession of a firearm, and he was deemed to have violated his probation. Father was cited for these new charges but not immediately arrested.

On June 17, 2015, officers responded to a 911 call at the apartment due to a custody dispute. Aunt and Uncle wanted to remove Austin from the residence but Father would not allow it. Mother was undecided and admittedly did not feel safe at the residence. It is not clear from the record how the situation was resolved.

On June 24, 2015, Aunt and Uncle filed a petition for dependency and neglect, for an emergency ex parte temporary custody order, for an ex parte temporary restraining order, and for permanent custody of Austin. Aunt and Uncle alleged that Austin had been in their physical care for the majority of his life. They alleged that on the date of the home search, Mother and Father had left Austin with an acquaintance in a downstairs apartment without the necessities needed for an infant. According to the petition, Aunt and Uncle learned about the incident and initially resumed custody of Austin "until [Mother and Father] would no longer allow them to care for the child." They alleged that Austin was dependent and neglected because Mother and Father did not have the financial or physical means to support the child, he was drug exposed, their residence was unsuitable and dangerous, the parents failed to provide supervision and medical care for the child, and he was exposed to a neglectful environment. That same day, the juvenile court entered an emergency temporary custody order and temporary restraining order placing Austin in the custody of Aunt and Uncle. Father went to jail for violating his probation on June 30

- 2 -

(where he would remain for the next nine months).

The juvenile court appointed counsel for Mother and Father. After two continuances, a preliminary hearing was held on July 21, 2015. By this time, Austin was eight months old. The juvenile court heard testimony from Mother, Father, Aunt, Mother's mother, a police sergeant, a probation officer, and an "agent" who participated in the search of the apartment. Father testified that he had been unemployed since Austin was born in November 2014. His name was not on the lease of the apartment. He had been placed on probation for a term of four years in connection with vandalism and methamphetamine charges, but he had tested positive on drug screens twice that year. Father had incurred three new charges as a result of the home search, and his probation was fully revoked for the four-year sentence. He expected to serve about a year of his sentence and admitted that he could not care for Austin at that point. Mother was also unemployed and admitted to using methamphetamine and relying on family members for support. She acknowledged having to call Aunt and Uncle to come and get Austin when she and Father were fighting. Even though Austin suffered from allergies, she admitted that she allowed smoking in the apartment, had not followed up on his medications, and had not obtained insurance for him.

Aunt had maintained calendars showing that she and Uncle had physical custody of Austin for over half of the days of every month so far in 2015 (January to May). She testified that there were periods when they did not hear anything from Mother or Father. Mother's mother also testified and confirmed that she and Aunt had taken Austin to his doctor's appointments at their own expense because he did not have insurance. She said Austin was behind on his immunizations by "at least two rounds of shots."

The juvenile court found probable cause that Austin was dependent and neglected according to three different statutory definitions due to neglect and his lack of medical care, citing Tennessee Code Annotated sections 37-1-102(12)(D), (F), and (G). The court found that Austin lacked insurance, that the parents allowed smoking in the apartment despite his allergies, Mother did not know the medications he was taking or why, and that missing his immunizations was "inexcusable." The court found that illegal drugs, drug paraphernalia, and a gun were found inside the apartment, also posing a danger to the child's health. The court found that both parents admitted use of methamphetamine when "a child this young is going to need constant care" and "needs the parents all of the time." It also found that their fighting was to the point that they had to call others to care for the child. The court found that Mother and Father relied on others for necessities and left the child with others for the majority of the time even though neither was employed. Finally, the court noted that due to Father's violation of his probation, he would not be able to provide for Austin for at least a year due to his incarceration. As such, the court found there was no less drastic alternative to removal and that custody was to remain with Aunt and Uncle. The case was set for an adjudicatory hearing.

On the scheduled date of the hearing, September 30, 2015, the juvenile court entered

an order establishing permanent guardianship upon agreement of the parties, stating that Mother and Father agreed that Austin was dependent and neglected for the reasons stated in the prior order. The parents agreed that reunification was not in the best interest of the child at that time and that placing permanent guardianship with Aunt and Uncle was in his best interest. Mother and Father were permitted to have supervised visitation with Austin for one six-hour period per week if supervised by each parent's mother. They could also call once per week to check on the child.

Austin turned one in November 2015. Father was released from his nine-month period of incarceration on April 11, 2016. Unfortunately, however, his behavior did not improve. Father was in and out of jail so many times over the next few years that it is admittedly difficult for this Court to determine all of the exact dates. (Father's "RAP Sheet" from the Giles County Sheriff's Department lists 24 charges for Father between 2012 and 2019.) In the meantime, Austin continued to reside with Aunt and Uncle and thrived in their care. Father would visit with Austin under the supervision of Austin's grandmother for six hours on the weekends when Father was not incarcerated. However, there were lengthy periods when Austin would not see or hear from Father due to his incarceration.

On February 28, 2020, when Austin was five years old, Aunt and Uncle filed a petition to terminate the parental rights of Father and Mother. At that point, Father had been incarcerated continuously for a period of one year, and he was currently housed at a maximum security prison. As grounds for termination of Father's parental rights, the petition alleged abandonment by an incarcerated parent for failure to support, abandonment by an incarcerated parent by wanton disregard for the child's welfare, persistent conditions, and failure to manifest an ability and willingness to parent.[3] The petition further alleged that termination was in the best interest of the child.

The trial court entered an order suspending visitation pending further orders. It also appointed a guardian ad litem for Austin and counsel for Father. Mother joined in the petition for purposes of consenting to adoption by Aunt and Uncle.

The termination trial as to Father was held on August 10, 2020. Father was transported from prison to attend the trial in person. He had also been deposed shortly before trial, and his deposition was submitted as well. At the beginning of trial, the trial judge and the parties' attorneys discussed the difficulty in identifying any four-month period in which Father had not been incarcerated for purposes of analyzing the definition of abandonment. Father explained that there had not been a four-month period when he was not incarcerated for several years, dating back to November 1, 2016 through March 1, 2017. Father's counsel confirmed that he was in agreement with using that period.

---

[3] Some other grounds were alleged but withdrawn prior to trial.

Father was 28 years old at the time of trial. He testified that he had been living with his grandmother when he was not incarcerated and that he could live with her or his mother upon his release from prison. He testified about working at a few places over the years, including two places of employment before Austin was born, one in 2014 (the year Austin was born), and one in 2015. However, he said he had not held any "regular" jobs since Austin was born but would occasionally do yard work, pressure washing, and similar work. Father said he had never sent money to Aunt and Uncle for the support of Austin because they made it clear at the time of the juvenile court proceeding that they "didn't want anything." He claimed that if he had been ordered to pay support then he would have paid it. Father pointed out that he has an older son from another relationship and is current on his child support obligation for that child. Father said he had purchased some clothes and shoes for Austin, but he kept them at his grandmother's house in case Austin needed a change of clothes during visits. Father said he had also bought some toys for Austin and that he bought him a watch for Christmas the previous year. He was currently working at the prison making 34 cents per hour, or $62 per month. He said he sent two months of his earnings ($124) to his mother to buy Christmas presents for Austin the previous year but that he used the rest to buy items for himself, such as hygiene products. He clarified that his mother was the one who paid his child support obligation for his oldest child, using her own money.

Father testified that he began drinking alcohol and smoking marijuana at the age of 16 and had started using "hard drugs" in the last few years. He testified that the board of probation and parole had sent him to a 28-day rehabilitation facility in 2017, and that he had completed that program. However, he continued to test positive for drugs thereafter, leading to further violations of his probation. Thus, Father conceded that the rehabilitation program did not "cure" his addiction and that he still had "a drug problem" at the time of trial. Father's current period of incarceration had begun with an arrest on February 22, 2019. On that date, he committed offenses for which he was charged with and eventually pled guilty to introduction of contraband into a penal institution and possession of methamphetamine. While incarcerated, Father had committed an assault, for which he also pled guilty. According to Father's testimony, he was serving an eight-year sentence concurrent with a seven-year sentence and another six-year sentence. His next parole hearing was scheduled for March 2022 (eighteen months after trial). At the time of trial, Father had not seen Austin in over a year due to his incarceration.

Despite his present inability to care for Austin, Father insisted that either his mother or his father could care for him until he was released. Father claimed that he was making changes for the better but admitted that it had been a slow and gradual process that he had been working on since Austin was born. Father said he had not filed anything in an attempt to regain custody of Austin because he still did not have a residence with a room for him. He had taken a couple of classes in prison but said that the programs had been discontinued due to the covid-19 pandemic. Still, Father claimed that being in prison had made him realize that he did not want to continue making bad decisions and losing years away from

his family. He acknowledged that he had been incarcerated for almost half of Austin's life. Father said he had last spoken with Austin by telephone about a month before the petition to terminate his parental rights was filed. Father claimed that he would talk to Austin on the telephone when Austin was visiting with Father's mother, which, he estimated, was at least once a month before the petition was filed.

The only other witness to testify at the termination trial was Aunt. She and Uncle had been married 23 years and had no minor children. Aunt testified that after she and Uncle cared for Austin on New Year's Eve when he was one month old, they had him for the majority of the time thereafter, totaling 115 out of the next 175 days. According to Aunt, Mother would ask her to come and get Austin during her fights with Father because Mother was afraid that Father was going to kill her. Aunt said she would immediately bathe Austin when he arrived from the apartment because he smelled so strongly of smoke. She described how she took Austin to medical appointments at her own expense because he did not have insurance and he had only had one immunization while in the parents' care. She said Austin was three to four months behind on his well-child visits. Aunt said she tried to assist Mother and Father by giving them diapers, food, hygiene items, and even a vehicle, but she later learned the vehicle "ended up title loaned." She agreed that she did not initially ask for child support because she did not expect the situation to go on for five years and she suspected that Father's grandmother, a widow who attended her church, would likely be paying any obligation that was ordered. Aunt acknowledged that Austin received a watch that probably cost around $49 for Christmas in 2019 but said she was not aware of him receiving any Christmas gifts or birthday gifts the previous three years. She said Austin was given a couple of Christmas gifts and toys the first year he was in her care. Aunt had not received any money from Father but said she had been given "a shirt a time or two."

Austin had resided exclusively with Aunt and Uncle for five years. Aunt estimated that out of the sixty months that Austin had been in their custody, there were only about six months, compiled, when Father was not incarcerated. During Father's most recent period of incarceration, spanning over a year, Aunt had not received any communication from Father by telephone, mail, or email. As such, Aunt testified that there was presently "no relationship" between Father and Austin.

Aunt's testimony disputed Father's claim that his mother had visits with Austin at least once a month, when he would speak with Austin by phone. According to Aunt, Father's mother had Austin for visits while Father was incarcerated only five times in 2016, seven times in 2017, four times in 2018, and four times in 2019. Thus, she said that Father *may* have called Austin during those four visits in 2019, but she had not been aware of any such communication. Aunt agreed that Father consistently exercised his six-hour visitation with Austin whenever he was not incarcerated, as Austin's grandmother ensured that Father attended the visits. However, Aunt said the transitions were always very traumatic for Austin. For instance, she described a period in 2017 when Austin experienced a lot of fear

and would come home after visits saying, "They're coming to get me." She also said Austin would "lash out and bite" after visits. Aunt said she and Uncle started attending visits with Father and Austin's grandmother for a time in order to make Austin feel more comfortable. She testified that Austin needs a very structured and consistent routine. Austin had undergone extensive testing and was required to get allergy shots once per week. Otherwise, he was doing very well, with a large support system.

After taking the matter under advisement, the trial court entered a 24-page written order terminating Father's parental rights. The trial court found by clear and convincing evidence that all four grounds for termination were proven and that termination was in the best interest of Austin. Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

The only issue raised in Father's brief on appeal is whether the trial court erred in finding clear and convincing evidence that termination is in the best interest of the child. Even though he does not present any issue regarding the grounds for termination of his parental rights, we must review the trial court's decision as to grounds as well. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").[4]

## III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

---

[4] In other cases in which attorneys have offered little or no argument regarding grounds for termination, apparently relying instead on this Court's duty as stated in *Carrington*, we have "caution[ed] counsel against the use of our Supreme Court's holding in this manner." *See In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *6 n.3 (Tenn. Ct. App. Nov. 6, 2020); *In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *6 (Tenn. Ct. App. Jan. 6, 2017) (citing Tenn. Sup. Ct. R. 8, RPC 8(3) (providing that lawyers are obligated to act as a zealous advocate on behalf of his or her client)). We do the same here.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.*

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.  DISCUSSION

### A.  Grounds for Termination

#### 1.  Abandonment by an Incarcerated Parent – Failure to Support

Tennessee Code Annotated section 36-1-113(g)(1) provides that one ground for termination of parental rights exists if "[a]bandonment" has occurred within the meaning of Tennessee Code Annotated section 36-1-102. When this petition was filed in February 2020, the relevant definition of abandonment provided, in pertinent part:

> (iv) A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration . . . . If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by

aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2019). Here, the parties' attorneys and the trial judge had a discussion at the beginning of trial about the difficulty of identifying the correct four-month period. Counsel for Aunt and Uncle suggested that they could "either build four months out of periods of time or we can go to the last consistent four-month period of time before [Father] was incarcerated." After questioning Father about his periods of incarceration, the parties settled on a continuous four-month period of nonincarceration from November 1, 2016 to March 1, 2017. We conclude that the parties and the trial judge identified the wrong four-month period. As reflected above, the applicable statute does not say that we continue looking backward until we locate a period of four consecutive months of nonincarceration.

When the petition to terminate parental rights was filed on February 28, 2020, Father had been incarcerated for just over a year, since February 22, 2019. Prior to his current period of incarceration, he had been out of jail for a period of just over two and a half months – he was incarcerated from October 10 to December 5, 2018, for violating his probation. Prior to that period of incarceration, Father had been out of jail for another period of almost two months, from August 15 (or perhaps August 18) until his arrest on October 10. Pursuant to the statute in effect when the petition was filed,

[I]f the four-month period prior to the petition's filing or the parent's incarceration is interrupted by a period or periods of the parent's incarceration "and there are not four (4) consecutive months without incarceration immediately preceding either event," the applicable four-month period shall be determined by "aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time."

*In re Gracie H.Y.*, No. M2019-00639-COA-R3-PT, 2020 WL 1249453, at \*15 (Tenn. Ct. App. Mar. 16, 2020) *perm. app. denied* (Tenn. June 16, 2020) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(iv)). Because Father was "incarcerated at the time the petition was filed and there are not four consecutive months prior to [his] incarceration, the correct method

of calculating the four-month period for purposes of abandonment is the aggregated period of time consisting of [Father's] periods of nonincarceration." *See id.* Stated differently, "'the trial court [is] required to determine the four-month period by piecing together [the parent's] periods of non-incarceration prior to the filing of the termination petition.'" *In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *11 (Tenn. Ct. App. Nov. 28, 2018) (quoting *In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at *9 (Tenn. Ct. App. May 5, 2017)). That did not occur here. *See In re Travis H.*, 2017 WL 1843211, at *9 (concluding that a trial court utilized the wrong four-month period because it looked to "the first consecutive four-month period in which Father was not incarcerated" instead of "piecing together Father's periods of non-incarceration prior to the filing of the termination petition").

However, a trial court's identification of the wrong four-month period is not always reversible error. "[A] miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period." *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019). For instance, in *In re J'Khari F.*, on the issue of failure to visit, "the parties incorrectly identified the relevant four-month period," but the trial court found that the mother had not visited the child "since August 2016," which necessarily "encompassed the entire relevant four-month period." *Id.* at *9 n.5; *see also In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020) ("As the trial court's findings of fact and conclusions of law include sufficient information to consider the correct four-month period, any error from the use of the incorrect four-month period is harmless."); *In re Savanna C.*, No. E2016-01703-COA-R3-PT, 2017 WL 3833710, at *9 (Tenn. Ct. App. Aug. 31, 2017) ("[I]nasmuch as the trial court's findings encompassed the correct determinative period, this correction [of the four-month period] does not affect the outcome of this action or the issues raised on appeal."); *In re Selena L.*, No. E2015-02059-COA-R3-PT, 2016 WL 4056185, at *7 (Tenn. Ct. App. July 27, 2016) (concluding that the trial court's "miscalculation of the relevant statutory period" was harmless error because it found that the parent failed to visit for a period of one year, which necessarily included findings of fact encompassing the correct four-month period); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2019) ("A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment[.]"). Likewise, in *In re Jessica V.*, No. W2019-01700-COA-R3-PT, 2020 WL 3125354, at *4 n.7 (Tenn. Ct. App. June 12, 2020), we noted that a factual discrepancy as to the start date of a parent's incarceration did not change our analysis because it was undisputed that the parent neither visited nor paid support during the four months preceding incarceration regardless of the start date.

Here, the trial court started out by stating that the critical four-month period spanned from November 1, 2016, to March 1, 2017. However, the evidence presented at trial in

August 2020 was not limited to that four-month period, and neither were the trial court's factual findings. Instead, the trial court found it was "uncontested [Father] failed to provide any monetary support for the child to [Aunt and Uncle] since June, 2015," when Austin entered their custody. The trial court noted that Austin had some clothes and toys at the home of Father's grandmother but that those items were not provided to Aunt and Uncle for the care of the child. The court also found that Father had no disability, had a history of working, and his "only impediment to working has been his criminal activity." It found that Father had no housing or transportation expenses and that he managed to pay for his own personal items, including cigarettes, when not incarcerated. It also noted that Father's child support obligation was current as to his older child.

The trial court's factual findings are amply supported by the record, and the facts clearly and convincingly establish Father's failure to support for a period encompassing the relevant four months. Father admitted that he never sent money to Aunt and Uncle. He said the reason for this was because Aunt and Uncle indicated at court during the dependency and neglect proceeding in 2015 that "they didn't want anything," and no child support was ordered by the court. Father testified that if a child support order had been entered, he would have paid child support, noting that he was up to date on his child support obligation for his older son. A father made a similar argument in *In re Sydney B.*, 537 S.W.3d 452, 460 (Tenn. Ct. App. 2017), claiming that he did not pay because "no child support order was ever entered directing him to do so." *Id.* We said that excuse did not hold weight in this Court. *Id.* "'[T]he law is clear that parents have a duty to support their children even absent a court order requiring them to do so.'" *Id.* at 459 (quoting *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *20 (Tenn. Ct. App. June 17, 2015)). "Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child[.]" Tenn. Code Ann. § 36-1-102(1)(H).

Father testified that when he was not incarcerated he would "do a little work here and there," such as yard work, pressure washing, and "different things."[5] However, the only item that Father described purchasing for Austin for any significant value was the watch for Christmas in 2019, *while* Father was incarcerated, which did not fall within any periods of *non*incarceration relevant for this ground. Aunt testified that in the five years Austin had been in her care, she had only received a few items from Father "or someone on his behalf," including "a shirt a time or two" and a couple of toys. She was not aware of Austin receiving any birthday gifts for the past three years or any Christmas gifts in the three years prior to his receipt of the watch in 2019. We conclude that these items, along

---

[5] We note that it is a defense to abandonment for failure to support that a parent's failure was not willful. Tenn. Code Ann. § 36-1-102(I). "The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." *Id.* Here, Father has not argued, before the trial court or on appeal, that his failure to support was not willful.

- 11 -

with toys or clothing that may have been purchased but kept at his grandmother's home for "a change of clothes and shoes," amounted to token support. *See In re Braxton M.*, 531 S.W.3d 708, 721 (Tenn. Ct. App. 2017) (agreeing with the trial court's conclusion that clothes and toys were token support); *see also In re Ava M.*, No. E2019-01675-COA-R3-PT, 2020 WL 2560932, at *15 (Tenn. Ct. App. May 20, 2020) (concluding that "sporadic gifts" were token in nature and "not a substitute for monetary payments for the day-to-day necessities of the Children, which is the essence of child support").

For the aforementioned reasons, we conclude that Aunt and Uncle presented clear and convincing evidence that Father abandoned Austin by failing to support him during his periods of nonincarceration over the past five years, including and exceeding the most recent four months of nonincarceration.

### 2. Abandonment by an Incarcerated Parent – Wanton Disregard

An alternative definition of abandonment applies if a parent is incarcerated at the time of the institution of the action (or has been incarcerated during all or part of the four months immediately preceding the institution of the action), and the parent "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). The term "wanton" means "'[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences.'" *In re O.W.*, No. W2019-01127-COA-R3-PT, 2020 WL 97727, at *5 (Tenn. Ct. App. Jan. 9, 2020) (quoting *In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *4 (Tenn. Ct. App. July 21, 2014)). "'The consequences at issue in termination cases relate to the child's welfare. In other words, the parent must be indifferent to how their conduct may affect their child's welfare.'" *In re Chandler M.*, 2014 WL 3586499, at *4. "Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse." *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Regarding this ground, the trial court found that Father has a criminal history dating back to 2012 but a "significant record of criminal behavior" since 2015, when Austin was placed in the custody of Aunt and Uncle. It acknowledged that Father attended rehabilitation when mandated by court order but found that he failed drug screens and incurred additional drug charges thereafter. The trial court found that Father "grossly neglect[ed]" his parental obligations when not incarcerated, failing to obtain housing, maintain employment, or meet his child's material or medical needs. It found that Father had "a distorted and unhealthy sense of the role of a parent," desiring that Austin would remain in limbo with Father's parents until Father is able to finally accept parental responsibility. In summary, the trial court concluded,

> It is difficult for this Court to imagine any clearer circumstance that demonstrates a broad pattern of behavior that renders a parent unfit than that

demonstrated by [Father]. When [Father] was not incurring new legal charges, he was incurring unnecessary violations of probation for failure to pay and failure to pass drug screens. [Father] had explicit instruction from his probation officer to attend rehabilitation to address his drug use, but failed to do so until ordered by the Court. He has failed to obtain housing or maintain employment. He demonstrates a dysfunctional willingness to allow his family to assume his responsibilities for him. And perhaps most indicative of his willful and wanton disregard is his testimony that a "good parent" is one who spends time with a child, instructing the child in right from wrong decisions, and that he deserves his parental rights so that he can be a "good parent" to Austin, a child who has not had any significant contact with [Father] in nearly 18 months. [Father] asserts this position from Riverbend Maximum Security Prison, where he will remain until March, 2022.

Again, the trial court's assessment is supported by the record. "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. Father has demonstrated every one of these. When Austin was an infant, Father left him in the care of others for the majority of his young life, even though Father was unemployed, so that he and Mother could continue partying. During that time, Austin was not receiving appropriate medical care. Even after Austin was found dependent and neglected and permanent guardianship was established with Aunt and Uncle, Father's lifestyle did not change. He was in and out of jail for the next five years, visiting Austin only under supervision for six hours on weekends when he was not incarcerated.

"The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). That is precisely the case here. This ground for termination was proven by clear and convincing evidence.

### 3.   Persistent Conditions

The next ground at issue is commonly known as "persistent conditions." It applies when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the

juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002).

Here, Austin was removed from the home he shared with Father by a court order entered during the dependency and neglect proceeding in 2015. Austin was removed due to Father's drug use, criminal behavior, and impending incarceration. These conditions persisted for the next five years. Father was in a continuous cycle of criminal activity, probation violations, and incarceration. Although Father was incarcerated at the time of trial and unable to abuse drugs, he admitted that he still had a drug problem. Thus, the original conditions that led to Austin's removal still persisted five years later, preventing Austin's safe return to the care of Father. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Due to Father's lengthy history of criminal behavior and drug use and lack of effort at rehabilitation, there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to him in the near future. Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Continuing the parent- child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home. Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). This ground was also sufficiently proven.

### 4. Failure to Manifest and Ability and Willingness to Parent

Tennessee Code Annotated section 36-1-113(g)(14) provides another ground for termination when:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

For this ground, two separate prongs must be proven by clear and convincing evidence: "(1) the parent [] failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Regarding the first prong,

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent [] to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent [] has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677. When considering whether the parent has demonstrated an *ability*, "we focus on 'the parent's lifestyle and circumstances.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). For *willingness*, "we look for more than mere words" and consider whether the parent attempted to overcome the obstacles that have prevented him or her from assuming custody or financial responsibility for the child. *Id.* "A lack of effort can undercut a claim of willingness." *Id.*

The second prong of this ground for termination requires a showing, by clear and convincing evidence, that "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Regarding this prong:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Malachi M.*, No. E2020-01114-COA-R3-PT, 2021 WL 1140272, at *6 (Tenn. Ct. App. Mar. 25, 2021) (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018)).

The trial court found that Father failed to manifest a willingness and ability to assume physical and legal custody and financial responsibility. The trial court aptly noted that placing the child in Father's care or custody "is practically impossible at this point" because Father was housed at a maximum security prison where a child cannot live. It found that Father will continue to be incarcerated until at least March 2022. It further found that Father appeared to have "no appreciable desire to become an appropriate parent for the child." The trial court found that Father had ample opportunities to complete tasks that would be associated with returning Austin to his care with the support of his probation officer. However, Father continued abusing drugs after attending rehabilitation, had unstable housing and income, never sought modification of custody or visitation, failed to complete any therapy, and failed to provide financial support for Austin. It found that Father had a "lack of realistic understanding of the child's needs" that posed a risk to the child. Thus, the trial court also found that the second prong was met in that placing the child in Father's care posed an immediate and substantial risk of harm to the child's emotional, psychological, and physical well-being.

We agree with the trial court's factual findings and its conclusion that both prongs of this ground were proven by clear and convincing evidence. Even five years after the removal of his child, Father had not demonstrated an ability or a willingness to personally assume legal and physical custody or financial responsibility for Austin. Tenn. Code Ann. § 36-1-113(g)(14). Father is incarcerated until at least 2022. Father's lifestyle and circumstances have not changed, and he simply has made no effort to change them. Considering all of the circumstances, the evidence is clear and convincing that placing Austin in Father's legal and physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" *Id.*; *see In re Anari E.*, No. M2020-01051-COA-R3-PT, 2021 WL 1828500, at *17 (Tenn. Ct. App. May 7, 2021) ("Given Father's unabashed drug use, as well as his continual failure to achieve stability, an unacceptable risk of harm would inhere were the Children returned to Father's care."); *In re Brayden E.*, No. M2020-00622-COA-R3-PT, 2020 WL 7091382, at *5 (Tenn. Ct. App. Dec. 4, 2020) ("Naturally, placing the Children with a parent who has not shown the ability and willingness to abide by the law would put them at substantial risk for harm."). Thus, this ground for termination was also met.

### B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). When the petition was filed in this case, Tennessee Code Annotated section 36-1-113(i) listed nine

statutory factors for consideration.[6]   Determining what is in the best interest of a child "involves more than simply 'tallying the number of statutory factors weighing in favor of or against termination.'"  *In re Neveah M.*, 614 S.W.3d at 679 (quoting *In re Gabriella D.*, 531 S.W.3d at 682).  The analysis is factually intensive, and "[t]he unique facts and circumstances of each case dictate the weight and relevance that a court should afford each statutory factor."  *Id.*  "A court must consider all the statutory factors but may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors."  *Id.*  We must bear in mind that the child's best interest is viewed from the child's perspective rather than the parent's perspective.  *In re Gabriella D.*, 531 S.W.3d at 681.  "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.'"  *Id.* at 681-82 (quoting Tenn. Code Ann. § 36-1-101(d)).

The first statutory factor is whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent[.]"  Tenn. Code Ann. § 36-1-113(i)(1).  The trial court found that this factor weighed in favor of termination because Father had failed to make any adjustment to his circumstances, as he "continues to be incarcerated but has failed to otherwise benefit from services or obtain stability."  We agree with this assessment.  Father's circumstances had remained the same for five years, with no adjustment to make it safe for Austin to be in his home.

The second factor is whether the parent "has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible."  Tenn. Code Ann. § 36-1-113(i)(2).  The trial court found that this factor also weighed in favor of termination because Father had access to social services through his probation, the juvenile court, and his incarceration in TDOC facilities, yet he failed to participate in services to address his issues.  We also agree with the trial court on this factor.[7]  Father testified during this case, "It's called the Tennessee Department of Corrections for a reason. When they send you in here, they give you the choices and the chances to make better."  However, Father had only taken a couple of classes.  He claimed that the pandemic had halted his efforts to attend classes.  However, his actions in the months prior to his most recent incarceration vividly demonstrate his lack of effort.  In August 2018, during one of Father's short two-month stints of nonincarceration, he tested positive for meth and was instructed by his probation

---

[6] "The Tennessee General Assembly recently amended the statutory best interest factors provided in Tennessee Code Annotated section 36-1-113(i)."  *In re Porcalyn N.*, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *12 n.6 (Tenn. Ct. App. May 21, 2021) (citing 2021 Tenn. Pub. Acts, ch. 190 § 1). However, "[t]his amendment does not affect the instant case because we apply the version of the statute in effect at the time the petition for termination was filed."  *Id.* (citing *In re Braxton M.*, 531 S.W.3d at 732).

[7] *See In re Gabriella D.*, 531 S.W.3d at 683 (analyzing this factor and discussing the testimony of a parent's probation officer regarding the parent's completion of supervised probation, random drug screens, and unsupervised probation).

- 17 -

officer to comply with the recommendations of a forensic social worker. The forensic social worker evaluated Father and directed him to begin a relapse prevention class on September 6 and attend every Thursday thereafter. Father failed to attend on September 6, although he claimed that his car "broke down." On September 12, he tested positive for meth, amphetamine, buprenorphine, and marijuana. On September 13, he again failed to report to the relapse prevention class. He was incarcerated from October 10 to December 5 for violating his probation. When Father reported to his probation officer after release, he was asked if he thought he needed inpatient rehabilitation but denied that he did, despite the recommendation of his probation officer. He was again instructed to begin relapse prevention class. He attended on December 13 but the following week he tested positive for meth and amphetamine. Another violation of probation was issued, and Father began his current period of incarceration on February 22. It was on that date that Father committed the offenses of introduction of contraband into a penal facility and possession of meth. Thus, Father failed to take advantage of services that could have helped him to adjust his circumstances, and at this point, a lasting adjustment does not appear possible.

The third factor to consider is whether the parent "has maintained regular visitation or other contact with the child." Tenn. Code Ann. § 36-1-113(i)(3). On appeal, Father points out that he "endeavored to visit with Austin when he was not incarcerated" and spoke with him by phone when he was. The trial court acknowledged that Father attended supervised visits regularly when he was not incarcerated. However, it found that he "was more frequently incarcerated" and that his current period of incarceration had already lasted over a year. The trial court found that Father had been incarcerated for nearly half of the child's life. Considering these circumstances, the trial court concluded that there had not been regular contact supporting a parent-child relationship and that this factor weighed in favor of termination. We agree.

The fourth factor is "[w]hether a meaningful relationship has otherwise been established between the parent [] and the child[.]" Tenn. Code Ann. § 36-1-113(i)(4). Father argues on appeal that due to his visits with Austin, he had "an enduring relationship" with him. The trial court found that Austin was five years old at the time of trial, that he had not had contact with Father in over a year, and prior to that time, he only sporadically had contact with Father. Thus, the trial court concluded that Austin had "no significant attachment" to Father and that this factor weighed in favor of termination. We agree with these findings and conclusions as well.

The next factor is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). The trial court found that Austin is stable in his relationship with Aunt and Uncle and their family support and that he enjoys a healthy routine in his home. It found that Austin demonstrates anxiety if there are changes to his routine but that Aunt and Uncle ensure that his needs are met even if they must make accommodations for him, as were necessary during the pandemic. It found that removing Austin from the care of

Aunt and Uncle would almost certainly be a detrimental change for the child and that placing him with a parent "with such glaring lack of stability as [Father]" would be especially aggravating. Thus, the trial court found that this factor weighed in favor of termination. Again, we agree with the trial court. Austin has primarily resided with Aunt and Uncle since he was one month old, and he had exclusively resided with them for five years at the time of trial. Taking him out of that stable environment would likely have a detrimental effect on his emotional, psychological, and medical condition.

The sixth factor is "[w]hether the parent [], or other person residing with the parent [], has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(6). The trial court found that this factor weighed in favor of termination because Father had shown neglect toward the child by exposing him to drug use and criminal activity as an infant. It found that Father had also shown physical and emotional abuse toward Mother when the parties lived together and that he had pled guilty to assault against another individual while he was incarcerated. The record supports the trial court's findings and conclusions regarding this factor.

Factor number seven is "[w]hether the physical environment of the parent's [] home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent [] consistently unable to care for the child in a safe and stable manner." Tenn. Code Ann. § 36-1-113(i)(7). The trial court found that this factor weighed in favor of termination as well. It found that Austin cannot live with Father while he is incarcerated at the maximum security prison, where Father will remain until at least March 2022. It found that, prior to his incarceration, Father had violated his probation by failing drug screens and pled guilty to drug-related criminal charges. It also noted Father's prior stipulation that Austin was dependent and neglected based in part on Father's drug use and criminal activity, and there was still no evidence that those conditions had been remedied. We agree. Austin cannot be with Father in his current physical environment, and the criminal activity and substance abuse in his home renders Father consistently unable to care for Austin in a safe and stable manner.

The eighth factor for consideration is whether the parent's "mental and/or emotional status would be detrimental to the child or prevent the parent [] from effectively providing safe and stable care and supervision for the child." Tenn. Code Ann. § 36-1-113(i)(8). The trial court found that this factor weighed in favor of termination because Father had continued to use drugs even after participating in rehabilitation and continued to engage in criminal activity, pleading guilty to charges as recently as October 2019. The trial court also noted Father's claim that he is ready to parent but that he needs his parents to raise the child until he is not incarcerated. We agree that Father's emotional status would be detrimental to the child and prevent him from effectively providing safe and stable care and supervision for the child. Father admitted that he still had a problem with addiction.

- 19 -

Factor nine is whether the parent "has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9). The trial court found that Father failed to offer any financial support to Aunt and Uncle and that this factor weighed in favor of termination. We agree.

To summarize, the trial court found that every factor weighed in favor of terminating Father's parental rights, and so do we. Considering the best interest of the child, from Austin's perspective, we find clear and convincing evidence that termination of parental rights is in his best interest.

Father argues on appeal that the Tennessee Supreme Court's decision in *In re Carrington* required the trial court to find that there would be "substantial harm" to Austin and that Father was "unfit," as part of its analysis, before it can terminate his parental rights. He relies on the following underlined language from *Carrington*:

> Tennessee Code Annotated section 36-1-113(c) provides:
>
> > Termination of parental or guardianship rights must be based upon:
> > (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> > (2) That termination of the parent's or guardian's rights is in the best interests of the child.
>
> This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d [240, 250 (Tenn. 2010)]; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated, the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*,

- 20 -

2 S.W.3d 180, 188 (Tenn. 1999).

*In re Carrington H*., 483 S.W.3d at 523. Thus, Father argues that in the absence of an express finding of "substantial harm" and "unfitness," *Carrington* "stands to prevent such termination from occurring."

Father has simply misinterpreted *Carrington*. This Court rejected essentially the same argument over a decade ago in *In re Audrey S.*, when a parent argued that a trial court "erred in terminating her parental rights because it failed to make a separate and explicit finding that she is an unfit parent or poses a risk of substantial harm to the welfare of the children." *In re Audrey S.*, 182 S.W.3d at 881. We explained:

> This argument misconceives the relationship between the operation of the termination statutes and the constitutional requirement that "before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated." *In re Swanson*, 2 S.W.3d at 188; *accord Hawk v. Hawk*, 855 S.W.2d at 577, 579, 581. This court has repeatedly recognized that the statutory grounds for termination of parental rights listed in Tenn. Code Ann. § 36-1-113(g) are all examples of parental conduct and situations that render a parent unfit or pose a risk of substantial harm to the welfare of a child. *White v. Moody*, 171 S.W.3d 187, 192-93 (Tenn. Ct. App. 2004); *In re C.D.C., Jr*., No. E2003-01832-COA-R3-PT, 2004 WL 1243994, at *8 (Tenn. Ct. App. June 7, 2004) (No Tenn. R. App. P. 11 application filed); *State Dep't of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *9 (Tenn. Ct. App. May 30, 2002) (No Tenn. R. App. P. 11 application filed); *State Dep't of Children's Servs. v. C.S.M.*, No. E2000-02806-COA-R3-JV, 2002 WL 385870, at *6 (Tenn. Ct. App. Mar. 13, 2002) *perm. app. denied* (Tenn. Sept. 16, 2002); *Ray v. Ray*, 83 S.W.3d 726, 732 n.7 (Tenn. Ct. App. 2001).
>
> In every case in which parental rights are terminated, there must be a "finding by the court by clear and convincing evidence that the grounds for termination o[f] parental or guardianship rights have been established," Tenn. Code Ann. § 36-1-113(c)(1), and this finding must be contained in a written order entered by the trial court, Tenn. Code Ann. § 36-1-113(k). Thus, as long as the juvenile court has correctly found that at least one of the statutory grounds for termination of parental rights exists, the constitutional requirement of a showing of parental unfitness or a risk of substantial harm to the welfare of a child has been satisfied. In effect, the constitutional unfit parent/substantial harm analysis is subsumed within the analysis of whether the statutory grounds for termination have been properly established. A separate finding of parental unfitness or substantial harm, in addition to a finding of the existence of at least one of the statutory grounds, would be

redundant.

*Id.* at 881-82.

We have reached the same conclusion post-*Carrington*. In *In re Sophia P.*, No. M2016-01400-COA-R3-PT, 2017 WL 1191299, at *11 (Tenn. Ct. App. Mar. 30, 2017) *perm. app. denied* (Tenn. June 13, 2017), a trial court separately analyzed the issue of "substantial harm" in addition to analyzing the grounds for termination. Quoting at length from *In re Audrey S.*, we explained that the trial court's additional analysis was "unnecessary" because "[e]stablishing a statutory ground for termination of parental rights is sufficient to establish substantial harm or parental unfitness and therefore support termination of parental rights." *Id.* "A separate and explicit finding of a substantial risk of harm is not required." *Id.* (citing *In re L.A.J., III*, No. W2007-00926-COA-R3-PT, 2007 WL 3379785, at *7 (Tenn. Ct. App. Nov. 15, 2007)); *see also In re Jude M.*, 619 S.W.3d 224, 244 (Tenn. Ct. App. 2020) ("When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest.") (citing *In re Audrey S.*, 182 S.W.3d at 877); *In re Daymien T.*, 506 S.W.3d 461, 475 (Tenn. Ct. App. 2016) ("When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge.") (citing *In re Audrey S.*, 182 S.W.3d at 877).

*Carrington*'s language is not inconsistent with these cases. The Tennessee Supreme Court first explained that the termination statute requires clear and convincing proof that at least one of the statutory grounds for termination exists and that termination is in the child's best interest. *In re Carrington H.*, 483 S.W.3d at 523. It then stated, "*These requirements ensure* that each parent receives the constitutionally required 'individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away.'" *Id.* (quoting *In re Swanson*, 2 S.W.3d at 188) (emphasis added). We discern no merit in Father's argument.[8]

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court and remand for further proceedings. Costs of this appeal are taxed to the appellant, Kelsey W., for which execution may issue if necessary.

---

[8] We also note that the trial court *did* expressly find both that Father was "unfit" and that continuing the parent-child relationship posed an immediate threat of substantial harm to Austin's well-being and development.

_____
CARMA DENNIS McGEE, JUDGE